UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAN HUYCK,

                Plaintiff,

      v.

CAROLYN W. COLVIN,[1]
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

**DECISION & ORDER**

16-CV-6331P


## PRELIMINARY STATEMENT

Plaintiff Jan Huyck ("Huyck") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 14). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Huyck's motion for judgment on the pleadings is denied.

---

[1] On January 23, 2017, after this appeal was filed, Nancy A. Berryhill became Acting Commissioner of Social Security.

# BACKGROUND

## I. Procedural Background

Huyck protectively filed for SSI/DIB on February 15, 2013, alleging disability beginning on December 31, 2009, due to pain and limited mobility in both knees, obesity, borderline diabetes, breathing problems, depression, fits of rage, back pain, high blood pressure, high cholesterol, dizziness, and gastroesophageal reflux disorder ("GERD"). (Tr. 151-58, 166, 171).[2] On May 13, 2013, the Social Security Administration denied Huyck's claim for benefits, finding that she was not disabled. (Tr. 91-92). Huyck requested and was granted a hearing before Administrative Law Jennifer Gale Smith (the "ALJ"). (Tr. 99, 119-24). The ALJ conducted a hearing on September 30, 2014. (Tr. 42-70). In a decision dated January 30, 2015, the ALJ found that Huyck was not disabled and was not entitled to benefits. (Tr. 19-38).

On April 25, 2016, the Appeals Council denied Huyck's request for review of the ALJ's decision. (Tr. 2-5). Huyck commenced this action on May 23, 2016, seeking review of the Commissioner's decision. (Docket # 1).

## II. Relevant Medical Evidence[3]

The record suggests that Huyck did not receive any medical treatment for several years prior to her applications for benefits. (Tr. 168). According to Huyck, although she suffered from several ailments, she had been unable to afford treatment. (Tr. 177). In connection with her applications, Huyck explained that she had recently applied for Medicaid. (*Id.*).

---

[2] The administrative transcript shall be referred to as "Tr. __."

[3] Those portions of the treatment records that are relevant to this decision are recounted herein.

On March 29, 2013, imaging of Huyck's lumbar spine was conducted at the request of her primary care physician, Subodh Debnath ("Debnath"), MD, due to Huyck's complaints of chronic low back pain. (Tr. 240). The imaging demonstrated mild L5-S1 bilateral facet arthrosis with no notable disc space narrowing. (*Id.*). The SI joints demonstrated mild degeneration. (*Id.*). The radiologist assessed intact vertebra, spondylosis and recommended an MRI if disc herniation was a concern. (*Id.*).

On April 5, 2013, Huyck attended an appointment with Kenneth Wrigley ("Wrigley"), PA, at Fingerlakes Orthopedics. (Tr. 291-93). Huyck indicated that she had been experiencing bilateral knee pain for several years and had not had recent imaging of her knees. (*Id.*). She rated her pain as five on a ten-point scale. (*Id.*). Huyck reported that she was unable to take NSAIDS due to her GERD and that she took Tylenol with little relief. (*Id.*). She indicated that she experienced diffuse pain in both knees, with worse pain in her right knee. (*Id.*). According to Huyck, she had difficulty navigating stairs and experienced some swelling in her knees. (*Id.*). Upon examination of her right knee, Wrigley noted small effusion, diffuse pain to palpation, quad strength of four out of five, no instability or thigh or groin pain with hip rotation, and a negative anterior drawer sign. (*Id.*). Examination of the left knee indicated similar results, although her quad strength was only three out of five. (*Id.*).

Imaging of her right knee demonstrated mild medial joint line narrowing and mild arthritis. (*Id.*). Imaging of her left knee was essentially normal. (*Id.*). Wrigley assessed bilateral knee pain with right mild degenerative joint disease. (*Id.*). He recommended that Huyck participate in physical therapy for strengthening and noted that Huyck was unable to take NSAIDS and unwilling to receive a cortisone injection. (*Id.*). He instructed her to return in six weeks. (*Id.*). Treatment notes from physical therapy indicated that Huyck was seen for an initial

evaluation and attended two subsequent sessions. (Tr. 304). Following her session on April 18, 2013, Huyck did not return for further therapy and was discontinued from the program. (*Id.*).

On April 10, 2013, Huyck was examined by state consultant Frank Norsky ("Norsky"), MD. (Tr. 250-55). She reported that her chief complaint was chronic pain in both knee joints, especially in her right knee. (*Id.*). Huyck indicated that her pain was aggravated by weight-bearing activities, including walking, standing, and climbing stairs. (*Id.*). She reported that she was only able to walk approximately one block at a time and could stand in one position for no more than thirty minutes. (*Id.*). According to Huyck, she needed to rest halfway up a flight of stairs. (*Id.*). Huyck also reported suffering from hypertension, anxiety, depression, obesity, and GERD. (*Id.*).

Upon examination, Huyck presented in no acute distress. (*Id.*). She had normal range of motion in her upper extremities and normal hand grip bilaterally. (*Id.*). Huyck was morbidly obese, but did not display any deformity of the lumbar spine, and her range of motion in her lumbar spine was normal. (*Id.*). Norsky observed tenderness to palpation in both knees, but Huyck's knees exhibited no heat or palpable intraarticular effusion, and her range of motion was normal. (*Id.*). Norsky also noted significant cyanosis of Huyck's feet, and palpation of her dorsalis pedis artery did not reveal any pulsation. (*Id.*).

Norsky assessed that Huyck suffered from morbid obesity, chronic knee pain due to osteoarthritis and obesity, mild chronic obstructive pulmonary disease, and a history of anxiety and depression. (*Id.*). According to Norsky, Huyck's prognosis for gainful physical employment was poor unless she underwent bariatric surgery and successfully lost weight. (*Id.*).

On May 17, 2013, Huyck returned for a follow-up appointment with Wrigley. (Tr. 294-96). She reported continued pain in her knees and that she had attended physical

therapy, which had increased her pain. (*Id.*). According to Huyck, heat also increased her pain, and she continued to perform a home exercise program. (*Id.*).

Upon examination, Wrigley apparently observed no range of motion in Huyck's knees, with greater pain in the right knee. (*Id.*). Huyck's quad strength was five out of five, and she was able to ambulate without a limp. (*Id.*). Wrigley assessed bilateral knee pain and mild degenerative joint disease in the right knee. (*Id.*). He opined that Huyck benefited from physical therapy and a home exercise program and noted that she continued to refuse cortisone injections for her right knee. (*Id.*). Wrigley did not believe an MRI was indicated and advised her to follow up as necessary. (*Id.*).

On June 17, 2013, Huyck attended her first appointment with Sean Stryker ("Stryker"), MD, at Orchard Family Health Care. (Tr. 326-27). She complained of ongoing severe knee pain bilaterally. (*Id.*). Huyck indicated that she believed that she suffered from rheumatoid arthritis and that her previous physician would not treat her knee pain unless she had bariatric surgery to address her obesity. (*Id.*). Stryker assessed that Huyck suffered from bilateral knee pain, osteoarthritis of the knee, morbid obesity, tobacco dependence, hypertension, hyperlipidemia, and Type 2 Diabetes Mellitus. (*Id.*). He ordered comprehensive bloodwork. (*Id.*).

On August 1, 2013, Huyck returned for another appointment with Stryker. (Tr. 328-29). She did not complain of any pain, but reported experiencing anxiety. (*Id.*). Stryker assessed generalized anxiety and recommended that she continue her current treatment regimen. (*Id.*).

On July 23, 2014, Huyck returned for an appointment with Janet Martin ("Martin"), NP, at Fingerlakes Orthopedics. (Tr. 306-07). Huyck presented with ongoing knee

pain, but reported some improvement with the use of a brace on her right knee. (*Id.*). She also reported that her primary care physician had ordered an MRI, but she was waiting to find out whether her insurance would cover it. (*Id.*). During the appointment, Huyck was fully weight-bearing, but reported instability, difficulty driving, increased effusion, and inability to bend. (*Id.*).

Huyck reported that her pain was moderate and had increased over the last ten years. (*Id.*). Her medical history was negative for osteoarthritis and gout. (*Id.*). According to Huyck, she wore a knee sleeve and experienced right ankle pain when driving. (*Id.*). She reported difficulty rising from a seated position and indicated that she had purchased a raised toilet seat for her home. (*Id.*). Huyck reported that she could not take NSAIDS due to GERD and had a prescription for Tramadol, but had not yet taken any. (*Id.*). Huyck indicated that physical therapy had aggravated her pain, but she was not interested in a cortisone injection. (*Id.*).

Upon examination, Martin noted tenderness of the right knee to palpation of the medial joint line. (*Id.*). Imaging demonstrated maintained joint space and no patella-femoral arthritis. (*Id.*). Martin assessed knee pain due to internal derangement of the right knee. (*Id.*). She recommended cortisone injections, NSAIDS, and physical therapy, but Huyck declined those treatments. (*Id.*). On October 14, 2014, Martin declined the ALJ's request that she complete a medical source statement relating to Huyck. (Tr. 310-18). According to Martin, she had only treated Huyck on one occasion and Huyck had refused the recommended treatments of physical therapy and injections. (*Id.*).

Huyck apparently began receiving treatment from Albert Devlin ("Devlin"), DO, in February 2014. (Tr. 283). Although Devlin's treatment records are not part of the record, he

submitted two medical source statements opining on Huyck's physical limitations, and the record suggests that he referred Huyck for mental health treatment relating to her anxiety and depression. (Tr. 283-89, 319-25, 332).

In an opinion dated September 11, 2014, Devlin indicated that he had been treating Huyck for approximately seven months. (Tr. 283-89). Devlin apparently observed that Huyck suffered from decreased range of motion in her back and right lower extremity and that she walked with a limp. (*Id.*). He apparently reviewed MRIs of her right knee and assessed that she suffered from internal derangement. (*Id.*). He also appears to have viewed an MRI of her lumbar spine. (*Id.*).

Devlin opined that Huyck was able to lift up to twenty pounds occasionally, but was unable to carry any weight. (*Id.*). According to Devlin, Huyck could sit, stand, and walk for approximately fifteen minutes at a time and could stand and walk for approximately fifteen minutes over the course of a workday. (*Id.*). He also believed that she was capable of sitting for up to three hours per day. (*Id.*). Devlin opined that Huyck required a cane to ambulate and could walk only approximately fifty steps without the use of her cane. (*Id.*). He did not believe that she could use her free hand to carry any small objects when ambulating with her cane. (*Id.*).

According to Devlin, Huyck did not suffer from reaching or handling limitations in her left hand, but was unable to reach overhead or push and pull with her right hand. (*Id.*). Additionally, he opined that she was unable to operate foot controls with her right foot, but could frequently operate controls with her left foot. (*Id.*). Devlin opined that due to neck and right knee ailments, Huyck was unable to climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (*Id.*). He also opined that Huyck should avoid certain environmental conditions, including unprotected heights, moving mechanical parts, operating motor vehicles,

humidity, wetness, dust, odors, fumes, and pulmonary irritants. (*Id.*). Devlin indicated that Huyck was able to shop, travel alone, and sort, handle and use paper files, but was unable to use public transportation, walk a block at a reasonable pace, climb steps at a reasonable pace, prepare simple meals, or care for her own personal hygiene. (*Id.*). In a report dated October 23, 2014, Devlin assessed the same limitations. (Tr. 319-25).

## III.     <u>Non-Medical Evidence</u>

In her applications for benefits, Huyck reported that she was born in 1969. (Tr. 166). According to Huyck, she completed the ninth grade and had previously worked as a cashier, assistant manager of a retail store, a caretaker, and a customer service representative. (Tr. 173). Huyck reported that she lived with her family, and spent the majority of her day in bed reading, watching television, and using the internet. (Tr. 178-79).

Huyck reported that she generally was able to care for her personal needs, but had difficulty reaching her feet and used an extended toilet seat. (Tr. 180). She was able to prepare simple meals daily and could perform household chores, including laundry, dishes, dusting, and sweeping. (Tr. 180-81). Huyck reported that she was able to drive herself, although she sometimes experienced sharp pain moving her foot from the gas pedal to the brake pedal. (Tr. 181-82). She was able to shop approximately twice a month for about two hours at a time. (Tr. 182). Huyck reported difficulty lifting, standing, walking, sitting, kneeling, and squatting, but reported no difficulty reaching or using her hands. (Tr. 183-84). She reported that she used a cane to assist her to get up from a seated position. (Tr. 185).

During the administrative hearing, Huyck testified that she was forty-five years old, had completed the eighth grade, and was able to read and write "very well." (Tr. 51). She

testified that she had previous work experience as an aide for an individual with a mental impairment and in various retail jobs. (Tr. 51-52). Huyck testified that she had also been employed at a call center, but her employment ended when the company closed. (Tr. 55). According to Huyck, her responsibilities included answering phones, placing orders, and addressing customer complaints. (Tr. 57).

Huyck testified that the reason that she was unable to work was her chronic right knee pain. (Tr. 54-55, 58). According to Huyck, she had refused to take any narcotic pain medication and had been advised by her physician that the impairment was not severe enough to warrant surgical intervention. (*Id.*). Huyck testified that she believed that she would be able to return to work at a call center, despite her knee impairment, at least on a part-time basis. (Tr. 56-58). Huyck also testified that she suffered from some back problems due to her weight. (Tr. 58).

Huyck explained that she refused to take any narcotic pain medication because she feared addiction and refused a cortisone injection because she was not confident that it would be effective and was apprehensive of the procedure. (Tr. 61). Instead, she took Tylenol or Ibuprofen to help manage her pain and used a knee brace. (*Id.*). According to Huyck, she also alleviated her pain by lying down and placing a pillow between her knees or icing them for relief. (Tr. 60). She estimated that she was able to sit for about thirty minutes before needing to change positions and was able to stand for about fifteen minutes at a time with the use of her cane. (Tr. 61-62). Huyck testified that she no longer drove due to knee pain, but was still able to go grocery shopping. (Tr. 63).

Huyck testified that she spent the majority of her day in bed, but sometimes got up to use the restroom or to visit with company. (Tr. 64-65). Huyck explained that she lived

with her son, who cared for her, and had a friend who assisted her with laundry. (Tr. 59, 64).

Huyck testified that her bedroom was on the first floor of the house so that she would not have to

navigate the stairs. (Tr. 65).

A vocational expert, Robert Baker ("Baker"), also testified during the hearing.

(Tr. 65-69). The ALJ first asked Baker to characterize Huyck's previous employment. (Tr. 66).

According to Baker, Huyck had previously been employed as a personal care aide and a

telephone order clerk. (*Id.*).

The ALJ then asked Baker whether a person would be able to perform any of

Huyck's previous jobs if she were of the same age, had the same education and vocational

profile, and could perform low stress work at the sedentary exertional level, but would need to

adjust positions every thirty minutes and should avoid concentrated exposures to environmental

extremes, could only occasionally climb ramps and stairs, stoop or balance, and was unable to

climb ladders, ropes or scaffolds, kneel, crouch, or crawl. (Tr. 67). Baker testified that such an

individual would be unable to perform Huyck's previous positions, but would be able to perform

other jobs that existed in the national economy, including positions of addresser, callout operator,

and document preparer/microfilming. (Tr. 67-68). According to Baker, an individual who used

a cane would be able to perform those positions because the positions were sedentary and

"would not require much moving at the stations." (Tr. 68).

## DISCUSSION

I.     Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity;
>
> (2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5) if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.    **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 22-34).  Under step one of the process, the ALJ found that Huyck had not

engaged in substantial gainful activity since December 31, 2009, the alleged onset date.  (Tr. 24).

At step two, the ALJ concluded that Huyck had the severe impairments of degenerative joint

disease of the right knee, degenerative disc disease of the lumbar spine, chronic obstructive

pulmonary disease ("COPD"), obesity, depressive disorder, and anxiety disorder.  (Tr. 25).  The

ALJ found Huyck's other impairments, including cervicalgia, hypertension, hyperlipidemia,

hypokalemia, hyperglycemia, diabetes mellitus, leukocytosis, GERD, dysmetabolic syndrome,

constipation, endometriosis, status post hysterectomy and cholecystectomy, chest pain, sinusitis,

bronchitis, tobacco use disorder, and smoking cessation, were not severe.  (*Id.*).  At step three,

the ALJ determined that Huyck did not have an impairment (or combination of impairments) that

met or medically equaled one of the listed impairments.  (Tr. 25-28).  With respect to Huyck's

mental impairments, the ALJ found that Huyck suffered from moderate difficulties in

maintaining concentration, persistence or pace, and mild difficulties in social functioning and in

performing activities of daily living.  (Tr. 27).  The ALJ concluded that Huyck had the Residual

Functional Capacity ("RFC") to perform sedentary work, including lifting and carrying ten

pounds occasionally and less than ten pounds frequently, standing and/or walking up to two

hours per day, and sitting for up to six hours per day.  (Tr. 28-31).  The ALJ concluded that

Huyck should be permitted to change positions every thirty minutes and could occasionally

balance, stoop, and climb ramps and stairs, but would be unable to kneel, crouch, crawl, or climb

ladders, ropes or scaffolds.  (*Id.*).  According to the ALJ, Huyck should be limited to low-stress

work environments entailing only occasional changes in the work setting and only occasional

judgment and decision-making. (*Id.*). She also should avoid exposure to environmental irritants. (*Id.*). At steps four and five, the ALJ determined that Huyck could not perform her prior work, but that other jobs existed in the national and regional economy that Huyck could perform, including the positions of addresser, call-out operator, and document preparer/microfilming. (Tr. 31-33). Accordingly, the ALJ found that Huyck was not disabled. (*Id.*).

### B. Huyck's Contentions

Huyck contends that the ALJ's determination that she was not disabled is not supported by substantial evidence and is the product of legal error. (Docket # 10-1). First, Huyck maintains that the ALJ's physical RFC assessment is flawed because it was not based upon a medical opinion of Huyck's functional limitations. (*Id.* at 7-12). Second, Huyck maintains that the ALJ failed to account for her obesity in formulating the RFC. (*Id.* at 12-13). Third, Huyck contends that the ALJ improperly weighed the medical opinions of evidence. (*Id.* at 13-16). Finally, Huyck maintains that the ALJ's step five determination is not supported because it was based upon a flawed RFC analysis. (*Id.* at 16).

## II. Analysis

### A. Physical RFC Assessment

I turn first to Huyck's contention that the ALJ's RFC assessment was flawed. (Docket # 10-1 at 7-12). An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

Huyck contends that the ALJ erred in determining the weight to be accorded to Devlin's and Norsky's opinions. (Docket # 10-1 at 13-16). Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence"). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must consider:

(1)     the frequency of examination and length, nature, and extent of the treatment relationship,

(2)     the evidence in support of the physician's opinion,

(3)     the consistency of the opinion with the record as a whole,

(4)     whether the opinion is from a specialist, and

(5)     whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199. The regulations also direct that the ALJ should "give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32 (alterations in original) (quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008). The same factors should be used to determine the weight to give to a consultative physician's opinion. *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011). "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *See id.*

I conclude that the ALJ provided "good reasons" for her decision to assign limited weight to Devlin's and Norsky's opinions. In her decision, the ALJ accorded Devlin's opinions "very little weight" because they were not supported by treatment notes,[4] were inconsistent with the overall medical evidence, including Huyck's history of conservative treatment, were rendered after Devlin had treated Huyck for only seven months, were inconsistent with Huyck's reported activities of daily living, were unsupported by explanation or clinical findings, and were inconsistent with Huyck's own testimony that she would be able to engage in part-time sedentary work. (Tr. 31).

---

[4] Because Devlin's treatment notes are apparently not contained in the administrative record, it is impossible to determine whether Devlin's opinions would have been supported or unsupported by those notes. *See Welsh v. Colvin*, 2016 WL 836081, *11 (W.D.N.Y. 2016) ("the ALJ's decision suggests that he discounted or did not credit the information in [the treating counselor's] letter because her treatment notes were not contained in the record[;] . . . [this was] not [a] permissible reason[] to discount the information supplied by [the treating counselor], particularly without first contacting [the counselor] or attempting to obtain her treatment records"). Nevertheless, as discussed in detail, the ALJ provided several other good reasons for discounting Devlin's opinions. *See Garcia v. Colvin*, 2015 WL 1280620, *6 (W.D.N.Y. 2015) ("the salient question is whether the additional reason[s] provided by the ALJ constitute[] a sufficient basis upon which to discount [the] opinion").

Specifically, the ALJ noted that the significant physical limitations assessed by Devlin were inconsistent with Huyck's overall treatment history, which included minimal and fairly conservative treatment. (*Id.*). As the record demonstrates, Huyck received sporadic treatment for her physical impairments and declined several conservative treatment options, including physical therapy and injections. Additionally, the ALJ properly recognized that Huyck and Devlin had not established a substantial treating relationship, as Devlin had been treating Huyck for only approximately seven months. (*Id.*).

Further, the ALJ noted that many of the limitations assessed by Devlin were contradicted by other evidence in the record, particularly Huyck's own statements concerning her ability to perform activities of daily living. As the ALJ noted, according to Devlin, Huyck was unable to reach overhead with her right arm, push or pull with her right arm, stoop, kneel, crouch, crawl, use public transportation, prepare simple meals, or care for her personal hygiene. (Tr. 283-89). Yet, Huyck reported to one of the consulting physicians that she was able to independently dress, bathe, prepare meals, complete general cleaning and laundry chores, engage in heavier lifting with assistance, shop independently, drive, and use public transportation. (Tr. 247). Similarly, Devlin assessed that Huyck suffered from significant upper extremity limitations, including limitations on her ability to reach overhead, push, or pull. (Tr. 283-89). As recognized by the ALJ, however, Devlin did not identify any impairment causing such limitations, and the assessed limitations were inconsistent with Huyck's own reports that she did not suffer from reaching or handling limitations. (Tr. 31, 65, 184). Finally, the ALJ recognized that the extreme limitations assessed by Devlin were inconsistent with Huyck's own testimony that she could perform a sedentary job on a part-time basis. (Tr. 31).

Huyck maintains that these inconsistencies do not justify discounting Devlin's opinions because they are irrelevant to Huyck's ability to perform sedentary work, particularly her ability to perform the sitting, standing, carrying, balancing, and climbing requirements of such work. (Docket # 10-1 at 14). I disagree. As an initial matter, many of the limitations assessed by Devlin are inconsistent with Huyck's own testimony that she could perform the requirements of sedentary work, at least on a part-time basis. In any event, the facial inconsistencies between several limitations assessed by Devlin and Huyck's own statements concerning her ability to perform those same functions is a proper basis upon which to discount Devlin's opinion as a whole.

Any suggestion by Huyck that the ALJ was not permitted to consider her daily activities in formulating her RFC (*id.* at 14-15) is incorrect. *See Durante v. Colvin*, 2014 WL 4843684, *2 (D. Conn. 2014) (ALJ properly discussed plaintiff's activities of daily living when formulating RFC; "[w]hile that court's admonition as to the ill wisdom of relying thoughtlessly on evidence of a claimant's ability to manage activities of daily living . . . for the purpose of discrediting evidence of more serious-seeming RFC restrictions in the work context is well-taken, the ALJ does not appear to have erred in this way here"); *Prue v. Comm'r of Soc. Sec.*, 2014 WL 37669, *10 (D. Vt. 2014) ("[i]t was proper for the ALJ to consider [plaintiff's] daily activities in determining her RFC"); *Bonville v. Colvin*, 2013 WL 3745882, *5 (N.D.N.Y. 2013) ("[c]ontrary to [plaintiff's] arguments, the ALJ properly considered her activities of daily living . . . , as well as [plaintiff's] testimony that she could work part-time, and evidence that she declared that she was ready, willing, and able to work during the time period for which she claims disability benefits"); *DiMartino v. Astrue*, 2009 WL 1652167, *3 (W.D.N.Y. 2009)

("[t]he ALJ also properly considered [p]laintiff's daily activities – including his part-time employment – in . . . determining his RFC").

        I reach a similar conclusion with respect to Norsky's opinion.  In her decision, the ALJ gave "reduced weight" to Norsky's opinion that Huyck had a poor prognosis for gainful physical employment on the grounds that it did not provide a function-by-function assessment of Huyck's capabilities and because it was not consistent with the conservative treatment she received for her physical impairments.  (Tr. 31).  Huyck maintains that the ALJ should not have discounted the opinion on these grounds without first recontacting Norsky.  (Docket # 10-1 at 15).  I do not agree that the ALJ was obligated to do so.  As recognized by the ALJ, Norsky's statement concerning Huyck's ability to work was wholly conclusory and amounted to a determination reserved for the Commissioner.  As such, it was not entitled to significant weight. *See Osbelt v. Colvin*, 2015 WL 344541, *3 (W.D.N.Y. 2015) (physician's letter "which concluded that '[claimant] is unable to work in any significant capacity given ongoing emotional and physical limitations' . . . [did] not specify the nature of such limitations, or describe how they would render plaintiff incapable of work," and thus constituted a "conclusory opinion concerning the ultimate issue of disability, [a] matter [that] is unquestionably reserved for the Commissioner") (internal quotation omitted); *Wilferth v. Colvin*, 49 F. Supp. 3d 359, 363 (W.D.N.Y. 2014) ("[the doctor's] opinion . . . does not specify any particular limitation on plaintiff's capacity:  it is no more than a conclusory opinion on the ultimate issue of disability, which is unquestionably a matter reserved to the Commissioner") (internal quotation omitted); *Thompson v. Colvin*, 2014 WL 7140575, *9 (D. Vt. 2014) (doctor's opinion that claimant was currently unable to work was not entitled to weight; "the opinions are conclusory and do not list any practical functional consequences of [claimant's] mental impairments, stating merely that

'complications with anxiety, PTSD[,] and agoraphobia' have caused her to be unable to work");

*Emery v. Astrue*, 2012 WL 4892635, \*6 (D. Vt. 2012) ("the ALJ was not obligated to afford

significant weight to [the doctor's] conclusory opinion that [claimant's] impairments limited 'her

ability to hold a full-time job'").

       The ALJ carefully reviewed Huyck's longitudinal medical record and explained at

length her determination that the significant limitations assessed by Devlin and Norsky were not

supported by the objective findings documented in the record or Huyck's own statements

regarding her abilities. Accordingly, I conclude that the ALJ did not violate the treating

physician rule by according "reduced" or "very little" weight to the opinions for the reasons she

explained. *See Harrington v. Colvin*, 2015 WL 790756, \*16 (W.D.N.Y. 2015) (ALJ properly

discounted treating physician opinion where it assessed limitations that were inconsistent with

findings contained in the treatment records and with admissions claimant had made concerning

his activities of daily living); *Wilferth v. Colvin*, 49 F. Supp. 3d at 362 (ALJ properly weighed

treating physician opinion and "adequately explained her reasons for declining to grant

controlling weight to his conclusion" where opinion was "inconsistent with other opinions in the

record, as well as statements made by the plaintiff himself, and none of the objective test records

. . . indicate[d] a level of disability greater than that reflected in the plaintiff's RFC, as

determined by the ALJ"); *Gladle v. Astrue*, 2008 WL 4411655, \*5 (N.D.N.Y. 2008) (ALJ

properly discounted opinion of treating physician where it was inconsistent with treatment

records and objective findings of the consultative examiner).

       Huyck argues that the ALJ's rejection of Devlin's and Norsky's opinions, even if

appropriate, resulted in an RFC determination unsupported by any medical opinion of record.

(Docket ## 10-1 at 7-12; 17 at 1-4). Huyck reasons that because the ALJ did not rely upon any

medical opinion containing a functional assessment of her work-related capabilities, her RFC is not based upon substantial evidence. (*Id.*). I disagree.

"It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding." *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013). Given the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d at 386). Although the Commissioner has a general duty to develop the record, it is ultimately "the plaintiff's burden to furnish . . . medical and other evidence of disability." *Threatt v. Colvin*, 2016 WL 1103864, *4 (W.D.N.Y. 2016).

Despite a general duty to develop the record, including obtaining medical opinions of the claimant's functional capabilities, the "regulatory language provides ample flexibility for the ALJ to consider a broad array of evidence as 'medical opinions.'" *Rouse v. Colvin*, 2015 WL 7431403, *5 (W.D.N.Y. 2015) (quoting *Sickles v. Colvin*, 2014 WL 795978, *4 (N.D.N.Y. 2014)). In any event, "it is not *per se* error for an ALJ to make the RFC determination absent a medical opinion." *Lewis v. Colvin*, 2014 WL 6609637, *6 (W.D.N.Y. 2014) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29 (2d Cir. 2013)). This is particularly true where the medical evidence shows relatively minor physical impairments, such that the ALJ "permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Id.* (quotations omitted). The salient question is whether the

record "contains sufficient evidence from which an ALJ can assess the [plaintiff's RFC]." *Id.* (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x at 34).

Having carefully reviewed the administrative record, I conclude that there is no gap, the ALJ properly formulated Huyck's RFC based upon a comprehensive review of the record, and her determination is supported by substantial evidence in the record. Huyck's medical records, imaging results, and her own statements regarding her capabilities demonstrate that the ALJ permissibly formulated Huyck's RFC to account for the impairments supported by the record without the assistance of a medical opinion.

Huyck testified unequivocally that the only physical impediment to her ability to work is her knee pain. (Tr. 54-55, 58). Although she claims that she has been disabled due to her knee impairment since December 31, 2009, the record suggests that she sought or received little treatment until early 2013, shortly after she applied for benefits.[5] Huyck alleges that she was unable to afford treatment; however, even after she obtained Medicaid assistance, her treatment was sporadic and conservative, and the objective findings were relatively mild. Further, despite her complaints of debilitating knee pain, Huyck refused the conservative treatment recommended by her treating providers, including physical therapy and cortisone injections.

None of her treating physicians recommended further treatment, nor did they believe that surgical intervention was indicated. Her physical examinations generally demonstrated minimal objective findings, and imaging of her knees demonstrated normal results on the left and, at most, mild degeneration on the right. (Tr. 250-55, 291-96, 306-07). Indeed, when asked to complete a medical source statement, one of the nurse practitioners at Fingerlakes

---

[5] Additionally, the record demonstrates that Huyck continued to work after 2009, albeit not at a substantial gainful level. (Tr. 24-25).

Orthopedics declined to do so, citing Huyck's infrequent treatment and refusal to engage in recommended treatment options. (Tr. 310-17).

Huyck's testimony during the administrative hearing about extremely limited activities of daily living is contradicted by other record evidence. In connection with her applications for benefits, for example, Huyck indicated that she was able to prepare simple meals, shop independently for approximately two hours at a time, drive, and perform household chores, including laundry, dishes, dusting, and sweeping. (Tr. 180-82). Similarly, during an April 5, 2013, consultative examination, Huyck told the examining physician that she was able to care for her personal hygiene, prepare meals, shop independently, drive, and complete general cleaning and laundry as needed, with assistance for heavy lifting. (Tr. 247). Her ability to engage in such activities certainly suggests that Huyck's physical limitations are not as debilitating as she alleges.

Huyck's own testimony supports the RFC assessed by the ALJ. According to Huyck, the sole impediment to her ability to work was her ongoing knee pain. (Tr. 54-55, 58). The ALJ accounted for limitations relating to her ongoing knee pain by limiting her to sedentary work that permitted her to shift positions every thirty minutes and use her cane and that would not require her to kneel, crouch, crawl or climb ladders, ropes or scaffolds. (Tr. 28). Huyck testified that she had previously worked full-time at a telephone call center and that she had stopped working there because the company had closed. (Tr. 55-56, 58). Huyck testified that she would be able to perform the requirements of that job, despite her knee pain, although perhaps not on a full-time basis. (*Id.*). The RFC assessment is also supported by the testimony of the vocational expert, who testified that each of the identified jobs required minimal movement at the work station. (Tr. 68).

In sum, the record contained Huyck's medical treatment records and testing results and, with the exception of treatment notes from Devlin, there are no apparent gaps in those records. A comprehensive review of the record demonstrates that Huyck suffered from a relatively narrow medical impairment and correspondingly narrow functional impairments, which limited to her ability to engage in activities requiring certain postural positions and prolonged standing or walking, particularly without an assistive device. With respect to these limitations, the record further suggests that Huyck's abilities would improve if she availed herself of available conservative treatments, which she chose to reject.

In any event, these limitations were expressly accounted for by the ALJ in her RFC assessment. The medical evidence and Huyck's own testimony concerning her activities of daily living do not suggest any additional limitations. Under such circumstances, I conclude that the ALJ was permitted to formulate an RFC without a medical opinion that directly assessed Huyck's ability to complete work-related functions. *See Crouse v. Colvin*, 2017 WL 975973, *6 (N.D.N.Y. 2017) (ALJ did not err by rejecting all medical opinions of record and assessing plaintiff's RFC based upon the medical record where the medical evidence demonstrated relatively minor physical impairment); *Countryman v. Colvin*, 2016 WL 4082730, *13 (W.D.N.Y. 2016) (ALJ was permitted to make common sense judgment regarding plaintiff's reaching limitation despite absence of medical opinion assessing that limitation where record showed relatively minor impairment and where "lack of . . . evidence in the record support[ed] a more restrictive limitation"); *Lay v. Colvin*, 2016 WL 3355436, *7 (W.D.N.Y. 2016) (ALJ was permitted to consider medical records and use common sense judgment to arrive "at a reasonable conclusion regarding [p]laintiff's RFC, as permitted by the [r]egulations"); *Crook v. Colvin*, 2016 WL 593567, *7 (D. Or. 2016) (ALJ did not err in failing to order vision evaluation where

treatment notes reflected that plaintiff's visual acuity was 20/50 and she had difficulty seeing fine print and conducting tasks requiring stereo vision and where the ALJ accounted for those limitations in his RFC); *Rouse v. Colvin*, 2015 WL 7431403 at *6 (no "*per se* error" where record did not contain "recent medical opinion that specifies [p]laintiff's specific functional abilities, or evidence that an RFC report was requested" where "RFC determination was based on substantial evidence because the record contained ample evidence for the ALJ to make a finding on disability"); *Lewis v. Colvin*, 2014 WL 6609637 at *6 ("[i]n light of the record evidence, the relatively minor physical impairments at issue, and the absence of physician/patient relationships, this [c]ourt concludes it was permissible for the ALJ to make an RFC determination without a treating source's opinion"); *Schade v. Colvin*, 2014 WL 4204946, *23 (E.D. Mo. 2014) (ALJ did not err by failing to order consultative examination to assess plaintiff's mental capabilities where plaintiff did not include allegations of depression or anxiety in her application and did not testify to any mental impairments that limited her ability to work); *Gillard v. Colvin*, 2013 WL 954909, *3 (N.D.N.Y. 2013) (ALJ did not err in failing to order consultative psychological exam where plaintiff sought sporadic treatment for mental health issues and did not identify any limitations caused by depression in application or hearing testimony); *Brown v. Astrue*, 2013 WL 310292, *3 (N.D.N.Y. 2013) (ALJ permissibly rendered common sense judgment regarding plaintiff's ability to lift and carry despite absence of medical source statement opining as to weight plaintiff could manage where record demonstrated relatively minor physical impairment and ALJ's determination was supported by medical evidence of record); *Bianco v. Astrue*, 2012 WL 441147, *11 (E.D. Mo. 2012) (ALJ did not err by failing to obtain medical opinion assessing plaintiff's functional capacity; "[w]ith respect to plaintiff's obesity and alleged depression, plaintiff and his physicians have not identified

additional functional limitations attributable to either condition[, and] [u]nder these circumstances, the ALJ was not required to obtain additional consultative examinations"); *Taylor v. Astrue*, 2012 WL 294532, *7 (D. Md. 2012) (ALJ adequately accounted for plaintiff's visual limitations caused by cataracts where visual acuity tests demonstrated corrected vision between 20/50 and 20/70 and ALJ "incorporated a specific visual acuity limitation reflecting these results into his RFC").

### B. <u>Consideration of Obesity</u>

Huyck also maintains that remand is warranted because the ALJ failed to adequately consider the effects of her obesity as required by Social Security Ruling 02-1p. (Docket # 10-1 at 12-13).  According to Huyck, the ALJ's boilerplate recitation of language concerning obesity within the decision is insufficient to demonstrate that her obesity was considered in connection with the formulation of her RFC.  (*Id.*).

Social Security Rule 02-1p instructs an ALJ "to consider the effects of obesity not only under the listings but also when assessing a claim at others steps of the sequential evaluation process, including when assessing an individual's residual functional capacity."  SSR 02-1p, 2000 WL 628049, *1 (2000).  In her decision, the ALJ explicitly considered Huyck's obesity at steps two and three.  At step two, she found that plaintiff had a severe impairment due to her obesity.  (Tr. 25).  At step three, the ALJ noted that there is no specific medical listing regarding obesity, but acknowledged her duty to "fully consider[] obesity in the context of the overall evidence in making this decision."  (Tr. 26).  In reviewing the medical record in connection with her RFC assessment, the ALJ recognized that Norsky had indicated that Huyck's "chronic knee pain is aggravated by obesity."  (Tr. 29).

Although the ALJ did not further explicitly discuss Huyck's weight during the RFC analysis, her assessment involved a comprehensive review of the medical records and Huyck's own statements concerning her ability to engage in physical activities, despite her chronic knee pain and weight. Thus, the ALJ's assessment of Huyck's functional limitations necessarily incorporated the effects of her obesity, particularly as they impacted or aggravated her knee impairment. On this record, I conclude that the ALJ's assessment adequately accounted for Huyck's obesity. *See Wilson v. Comm'r of Soc. Sec.*, 2014 WL 4826757, *10 (N.D.N.Y. 2014) ("[t]he fact that an item of evidence is not *discussed* does not necessarily mean it was not *considered*[;] [c]ircuit law does not require [ALJs] to single out obesity for discussion in all cases . . . [, and] "when an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the claimant, the claimant's obesity is understood to have been factored into their decision"); *Rivera v. Comm'r of Soc. Sec.*, 728 F. Supp. 2d 297, 331 (S.D.N.Y. 2010) (ALJ adequately accounted for plaintiff's obesity where he explicitly discussed obesity at steps two and three and his comprehensive analysis necessarily incorporated limiting effects of obesity, "primarily as they were intertwined with the effects of his other conditions").

Huyck also appears to suggest that the medical records demonstrated that "continued treatment of the knees would not be warranted until [Huyck] first lost weight." (Docket # 10-1 at 13). Her suggestion mischaracterizes the record. Although Huyck reported to Stryker that her previous physician "would not do anything for her until she had bariatric surgery" (Tr. 326), there is no objective evidence in the record to support this statement. Rather, the record overwhelmingly demonstrates that Huyck was offered a range of treatment options for her ongoing knee pain, including narcotic medication, physical therapy and cortisone injections.

C.    **Step Five Assessment**

I turn last to Huyck's argument that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. (Docket # 10-1 at 16). Because substantial evidence supports the ALJ's RFC determination, Huyck's contention fails. *See Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (citing *Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge")).


**CONCLUSION**

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 14)** is **GRANTED**. Huyck's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Huyck's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                    *s/Marian W. Payson*
                                    MARIAN W. PAYSON
                                    United States Magistrate Judge


Dated: Rochester, New York
         July 11, 2017